**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**

**DANIEL RAY BROWN,**                                                                **PLAINTIFF**
**ADC #88140**

**v.**                                       **Case No. 5:10-cv-00326-KGB/BD**

**RON CHISM AND**
**MARCIE JOHNSON**                                                                  **DEFENDANTS**

<u>**FINDINGS OF FACT AND CONCLUSIONS OF LAW**</u>

This matter came for a bench trial on February 24, 2014.  Plaintiff Daniel Ray Brown appeared through his attorney.  Defendants Ron Chism and Marcie Johnson appeared through their attorneys.  Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following specific findings and conclusions.

1.      On November 12, 2010, Mr. Brown, an inmate in the Arkansas Department of Corrections ("ADC"), filed this lawsuit under 42 U.S.C. § 1983 alleging that Mr. Chism and Ms. Johnson were deliberately indifferent to his serious medical needs while he was assigned to the Arkansas Comprehensive Substance Abuse Treatment Program-Therapeutic Community ("CSATP/TC") at the ADC and thereby violated his right to be free from cruel and unusual punishment under the Eighth Amendment (Dkt. No. 73).[1]

2.      Mr. Brown was permitted to proceed on his deliberate-indifference claims against separate defendants Mr. Chism and Ms. Johnson in their individual capacities only (Dkt. No. 49).

3.      The Court has considered the testimony of witnesses.  In a bench trial, the trial judge is the sole judge of the credibility of the witnesses and the weight to be given their testimony.  *See BLB Aviation S.C., LLC v. Jet Linx Aviation, LLC*, 748 F.3d 829, 836 (8th Cir.

---

[1]  Mr. Brown included other claims in his complaint, but those other claims were dismissed by prior Orders and are no longer a part of this lawsuit (Dkt. Nos. 22, 49).

2014).   Conflicting witness testimony was presented at this trial on several key issues.   This Court has carefully considered the issue of witness credibility.

4.      The Court has considered only those exhibits admitted by the parties' stipulation, including all of plaintiff's exhibits and defendants' exhibits one through 14, 16 through 24, and 26 through 31.

### The Defendants Mr. Chism and Ms. Johnson

5.      Mr. Chism has been employed by the ADC for approximately 15 years and has worked at the Tucker Unit for approximately 13 of those 15 years.   Mr. Chism has worked as the substance abuse program coordinator for approximately seven years.   He held that position in 2010, when the events about which Mr. Brown complains occurred.

6.      Ms. Johnson was employed by the ADC in 2010.   She worked at the Tucker Unit as a mental health advisor.

7.      Along with Ms. Johnson, there was one other mental health advisor at the Tucker Unit in 2010.

8.      As a mental health advisor, Ms. Johnson taught substance abuse, education, and anger management classes.   She performed segregation rounds.   She and the other mental health advisor saw all inmates at the Tucker Unit who complained of or had any issues regarding mental health.

9.      As a mental health advisor, Ms. Johnson also facilitated appointments at the Psychiatric Clinic.   She assessed inmates who had potential mental health issues, bringing them before the psychiatrist, if warranted and necessary, so that those inmates could be evaluated and provided treatment and medications the psychiatrist deemed necessary.

10.     Ms. Johnson claimed that, as a mental health advisor, she had indirect involvement with CSATP/TC.  She explained that facilitators of that program referred inmates to the mental health advisors if the facilitators believed inmates participating in the program needed to speak with a mental health advisor or the inmates participating in the program could request directly to speak with a mental health advisor.

**<u>Mr. Brown's Background</u>**

11.     Mr. Brown was on parole but had his parole revoked on or about July 26, 2010. Defs.' Ex. 1.  He returned to prison on or about July 29, 2010, for one year with a special stipulation or mandate that he complete a therapeutic community program at the ADC during his term of imprisonment.  *Id.*

12.     Mr. Brown testified that, at his parole revocation hearing, he felt that his mind was being controlled and that the hearing examiner resembled a robot.

13.     When Mr. Brown arrived at the ADC, like nearly all inmates, he went to the Diagnostic Unit for a period of days to be evaluated.

14.     Mr. Brown claimed in the Diagnostic Unit that he was having mental issues, memory problems, and believed that he might have been poisoned while at the Boone County, Arkansas, jail.

15.     On August 4, 2010, while he was housed at the Diagnostic Unit, Mr. Brown signed a request for mental health treatment.  *See* Defs.' Ex. 3.

16.     On or about August 9, 2010, Mr. Brown was seen by Brenda Dixon of the mental health department.  Ms. Dixon prepared a condensed health services encounter regarding the meeting.  *See* Defs.' Ex. 4.

17.     According to the August 9, 2010, condensed health services encounter, Mr. Brown reported that he had short-term memory problems, that he was stressed out, that he was having anxiety problems, and that he was paranoid.  He also reported that he could not sleep due to racing thoughts.

18.     It appears based on the August 9, 2010, condensed health services encounter that Mr. Brown was referred to the Psychiatric Clinic while at the Diagnostic Unit.  *Id.*

19.     Mr. Brown testified that he did not go to the Psychiatric Clinic nor did he follow-up with anyone regarding this referral.

20.     Mr. Brown transferred from the Diagnostic Unit to the Tucker Unit.

**August 24, 2010 Enrollment In CSATP/TC**

21.     At the Tucker Unit, Mr. Brown enrolled in CSATP/TC.

22.     Neither Mr. Chism nor Ms. Johnson was involved in the decision to stipulate or mandate that Mr. Brown complete the CSATP/TC.

23.     The hours that inmates in CSATP/TC are permitted to sleep are not set by Mr. Chism or Ms. Johnson.

24.     The time that inmates in CSATP/TC are called to meals are not set by Mr. Chism or Ms. Johnson.

25.     The CSATP/TC is a substance abuse program with a behavior modification component.

26.     Inmates who are stipulated or mandated to complete the CSATP/TC have priority in being admitted to the program.  Once admitted, the program is the same for those inmates who are stipulated or mandated to complete it and for those inmates who are not.

27.     Mr. Brown enrolled in CSATP/TC on or about August 24, 2010.  *See* Defs.' Ex. 5.

28.     Obadiah Davis, the primary counselor for Mr. Brown in CSATP/TC, reviewed with Mr. Brown documents regarding enrollment in CSATP/TC prior to Mr. Brown's signing those documents.  *Id.*

29.     During his meeting with Mr. Davis on August 24, 2010, while enrolling in CSATP/TC, Mr. Brown signed several treatment contracts.  *See* Defs.' Ex. 6.

30.     During this meeting, Mr. Davis went through with Mr. Brown documents that addressed initial entry for the program.  *See* Defs.' Ex. 7.  These documents asked about problems that Mr. Brown may have been experiencing and called upon Mr. Brown to provide a brief history.  These documents also addressed goals for participants to achieve in the program. *Id.*

31.     Although at trial Mr. Brown testified that he had concerns that he might not be mentally able to enter or complete CSATP/TC, Mr. Brown admitted that he did not share those concerns in August 2010 with Mr. Davis.

32.     Mr. Brown testified that he had issues with sleep deprivation and perhaps issues with withdrawal from methamphetamines when he entered CSATP/TC.

33.     Mr. Brown testified that the stress he experienced from participating in CSATP/TC might have created additional problems for him.

34.     Mr. Brown admits that, during his August 24, 2010, meeting with Mr. Davis, he did not discuss with Mr. Davis any problems he was having at that time.

**Accessibility Of Mr. Chism And Mr. Davis**

35.     Mr. Chism was accessible to inmates in the CSATP/TC.  His office was housed in Barracks 7.  He received and accepted oral and written requests from inmates who wished to speak with him.

36.     Mr. Chism also informed inmates that, if an emergency situation occurred, the inmate could come right to him to speak about the situation without first making a request.  He then determined whether the situation truly was an emergency and addressed the situation accordingly.

37.     Mr. Brown did not ever inform Mr. Chism of an emergency.

38.     Mr. Chism does not recall ever being told by any staff member that Mr. Brown claimed to have an emergency.

39.     Mr. Davis had an office inside of Mr. Brown's barracks.

40.     Mr. Brown testified that he did not speak to Mr. Davis very often.

**Participation In CSATP/TC**

41.     Once enrolled in the CSATP/TC, Mr. Brown claimed that he initially thought other inmates were targeting him and out to get him or were being sent by the counselors to provoke a response from him.

42.     Mr. Brown claimed that he was told while in the CSATP/TC that he was "bullet proof" and that it set him off.  He did not understand it initially and questioned whether someone was going to shoot him or threaten him.

43.     Mr. Brown acknowledged that he later came to understand that, by saying this, he was being told that he had a 30-day protective shield, so to speak, whereby he would not get punished for violating the rules.

44.     Mr. Brown claimed his symptoms got worse throughout September.

45.     Mr. Brown claimed he believed he was being brain washed.

46.     Mr. Brown claimed he was paranoid.

47.     Mr. Brown claimed he heard auditory hallucinations.  The voices that Mr. Brown heard were very real to him.

48.     Mr. Brown claimed he was having conversations or hearing conversations that had taken place in the past and that may have been taking place in the present.

49.     These conversations were sometimes about him.

50.     Mr. Brown claimed that he saw things out of the corners of his eyes and that, sometimes, the room in which he was in would move.

51.     Mr. Brown testified that these events were very real to him and were disturbing, frightening, and scary.

52.     Mr. Brown claimed that, at some point, he requested mental health treatment—probably two or three times—but received no response.

**September 22, 2010 Progress Report**

53.     On September 22, 2010, Mr. Davis met with Mr. Brown for a monthly progress summary after Mr. Brown completed phase one of CSATP/TC.  *See* Defs.' Ex. 9.

54.     At that time, Mr. Davis and Mr. Brown discussed the treatment to be given during phase two of CSATP/TC.

55.     Mr. Brown signed the form acknowledging the monthly progress summary and discussion.

56.     Mr. Brown did not share with Mr. Davis any of the problems that he claimed he was experiencing during the CSATP/TC.

**October 5, 2010 Grievance**

57.     On October 5, 2010, Mr. Brown filed a step-two formal grievance claiming that he had not been issued certain clothing.  He did not in that grievance complain about any mental health issues.  *See* Defs.' Ex. 10.

**October 12, 2010 Progress Report**

58.     Mr. Brown met with Mr. Davis on October 12, 2010, for another meeting to discuss progress in CSATP/TC.  *See* Defs.' Ex. 11.

59.     Mr. Brown admitted he did not speak with Mr. Davis about his claimed mental health issues, even though Mr. Brown claims he experienced them at the time.

**October 12, 2010 Grievance**

60.     On October 12, 2010, Mr. Brown also signed and submitted an informal resolution grievance.  *See* Defs.' Ex. 12.  This was the same day that Mr. Davis spoke with Mr. Brown about write-ups and pullups regarding other inmates in CSATP/TC.

61.     On all grievances, Mr. Brown was asked whether the grievance related to medical or mental health issues.  On the October 12, 2010, informal resolution, Mr. Brown wrote in "no" when asked if the grievance concerned medical or mental health services.  *Id.*

**October 21, 2010 Progress Report**

62.     On October 21, 2010, Mr. Brown met with Mr. Davis for another monthly progress report.  *See* Defs.' Ex. 13.

63.     Mr. Brown did not express any mental health concerns to Mr. Davis during the October 21, 2010, meeting.

64.     At various times during the trial, Mr. Brown testified that he did not share his problems with Mr. Davis because he believed Mr. Davis and others were discriminating against Mr. Brown based on his race.

65.     Mr. Brown admitted that the first time he complained of alleged race discrimination was when he wrote a letter in November 2010 to Roger Cameron, who is Mr. Chism's supervisor and who held the position of Drug Coordinator at the ADC.  *See* Defs.' Ex. 14.

66.     Mr. Brown also claimed that he did not discuss his concerns with Mr. Davis because he did not want to be kicked out of CSATP/TC due to mental health issues, especially because it was a program he was required to complete.

### October 22, 2010 Letter To Mr. Cameron

67.     On October 22, 2010, Mr. Brown wrote a letter to Mr. Cameron.  *See* Pl.'s Ex. 5; Defs.' Ex. 14.

68.     Mr. Brown claimed that he never received a response from Mr. Cameron and never met with Mr. Cameron.

69.     Mr. Cameron likely received the letter from Mr. Brown based on a written communication between Mr. Chism and Mr. Cameron.

### November 5, 2010 Meeting With Mr. Chism And Mr. Davis

70.     On November 5, 2010, Mr. Brown met with Mr. Chism and Mr. Davis.

71.     Prior to this meeting, Mr. Chism received from Mr. Cameron a copy of Mr. Brown's October 22, 2010, letter.

72.     Mr. Davis wrote a progress note about the November 5, 2010, meeting.  *See* Defs.' Ex. 16.

73.     Mr. Chism did not know, before receiving Mr. Brown's October 22, 2010, letter, that there were complaints of racial issues in CSATP/TC or that Mr. Brown had complained about mental health issues.

74.     Mr. Brown testified that, during the November 5, 2010, meeting, he was slightly embarrassed about his allegations of race discrimination.  He admitted that perhaps he was a little too suspicious or paranoid when he made those allegations.  He dropped the allegations of race discrimination during that meeting and wanted to move passed that.

75.     Mr. Brown acknowledged during that meeting that he was comfortable with his inmate peer counselors in CSATP/TC and thought that they were doing a good job.

76.     During the meeting, Mr. Brown still claimed to be suffering from hallucinations, auditory hallucinations, bad thoughts, and mental health issues.

77.     As a result of Mr. Brown's claims of mental health issues, Mr. Chism said that he would refer Mr. Brown to mental health services.

78.     Mr. Chism admitted that Mr. Brown's claims of mental health issues concerned him.

79.     Overall, however, Mr. Chism thought that Mr. Brown seemed fine during the November 5, 2010, meeting and seemed to be adjusting pretty well to the treatment process.

80.     Mr. Chism has encountered other inmates who claim to be experiencing hallucinations.

81.     Mr. Chism understands that hallucinations may be a side effect of prolonged drug use.

82.     Mr. Chism acknowledged that his role is not to determine whether an inmate is experiencing hallucinations but instead is to refer an inmate to mental health services when he or she claims to be experiencing hallucinations.

83.     Mr. Brown acknowledged that Mr. Chism is not a mental health counselor who could have provided treatment to him.

84.     Mr. Brown contends that, based on his perception, Mr. Chism could have pointed Mr. Brown in the right direction for mental health treatment, said that he would do so, but then did not.

85.     Mr. Chism testified that, that same day after his meeting with Mr. Brown, he called mental health services and spoke with someone there.  Mr. Chism did not recall whether he spoke with Ms. Johnson or Ms. Sanders, the other mental health advisor.

86.     Mr. Chism testified that normally he would have reported to mental health services the inmate's complaints, asked if mental health services received a request for services from the inmate, and asked if mental health services could see the inmate regardless.

87.     Mr. Chism testified that he did that here, although he recalled nothing else about the conversation with the mental health advisor.

88.     Mr. Chism admitted that he has no authority to tell a mental health advisor when to see or whether to see an inmate.

89.     At the time that Mr. Chism met with Mr. Brown on November 5, 2010, Mr. Brown did not mention hurting himself or anyone else.

90.     Mr. Chism testified that he typically asks inmates if they feel like harming themselves or anyone else.  Mr. Chism claimed that, if an inmate threatens to harm himself or

another inmate, typically the inmate is not allowed to leave his presence until mental health services sees the inmate immediately.

91.     Mr. Chism acknowledged that, during his meeting with Mr. Brown, he did not ask Mr. Brown whether Mr. Brown felt like harming himself or anyone else.

92.     Mr. Brown did not indicate that his mental health issues were urgent, according to Mr. Chism.

93.     Mr. Chism sent an email to his supervisor, Mr. Cameron, after his meeting with Mr. Brown.  *See* Defs.' Ex. 17.

### November 5, 2010 Inmate Request Form

94.     On or about November 5, 2010, Mr. Brown filed an inmate request form, directing it to the Assistant Warden, regarding an emergency grievance that Mr. Brown had written the month before.  *See* Defs.' Ex. 18.

95.     Mr. Brown did not mention mental health issues in this inmate request form.  *Id.*

### November 7, 2010 House Incident Report

96.     On November 7, 2010, Mr. Brown signed a house incident report about verbal systematic confrontation.  *See* Defs.' Ex. 19.

97.     Mr. Brown did not mention the mental health issues about which he complains in this lawsuit in this house incident report.  *Id.*

### November 9, 2010 Behavior Contract

98.     Mr. Brown received a behavior contract on November 9, 2010.  He admitted to trafficking and trading and telling another client to catch the corner.  *See* Defs.' Exs. 21, 22.

**Prior Requests For Mental Health Services**

99.     Mr. Brown claimed that, sometime before he met with Ms. Johnson and perhaps even before he met with Mr. Chism, he submitted three or four requests for interviews to mental health services by placing them into the ADC mailbox.

100.     Mr. Brown claimed that he submitted these requests prior to submitting his inmate request form for mental health services on November 8, 2010.  *See* Pl.'s Ex. 6; Defs.' Ex. 20.

101.     Mr. Brown testified he submitted these requests to mental health services not because he wanted out of CSATP/TC but because he was having difficulty dealing with the program and attempted to seek assistance from mental health services.

102.     Mr. Brown claimed he never received a response from these requests.

**Mr. Goddard's Observations**

103.     Steven Goddard, an inmate in the ADC, testified that he observed Mr. Brown babbling on while walking up and down the hallway going to yard call and then out in the yard, not talking to anyone in particular and saying the same thing.

104.     Mr. Goddard described Mr. Brown's behavior as erratic and described him as unhinged.

105.     Mr. Goddard testified that this unusual behavior started when Mr. Brown was participating in CSATP/TC.

106.     Mr. Goddard testified that he spoke to Mr. Brown and asked him what was wrong.  Mr. Goddard explained that Mr. Brown said he thought people were trying to brain wash him or something.

107.     Mr. Goddard also testified that, prior to these observations and Mr. Brown's demonstrating this behavior, Mr. Goddard had seen Mr. Brown and believed him to be of sound mind, intelligent, and smart.

### November 8, 2010 Request For Mental Health Services

108.     On or about November 8, 2010, Mr. Brown submitted an inmate request form for mental health services.  *Id.*

109.     In his inmate request form for mental health services, Mr. Brown stated that he believed he could "easily snap and crack one of these clients" meaning hurt someone.  *Id.*

110.     In regard to that statement, Mr. Brown testified that normally he is a soft-spoken person who is nonviolent and that he has no history of violence.

### November 10, 2010 Emergency Mental Health Grievance

111.     Mr. Brown testified that he also filed an emergency mental health grievance on November 10, 2014.  Mr. Brown said that he gave his emergency mental health grievance to another officer who then took the grievance to Ms. Johnson.

112.     According to Mr. Brown, ADC policy stated that the ADC was to respond to an emergency mental health grievance within 24 hours.  If there was no response within 24 hours, the inmate had a right to appeal.

113.     Mr. Brown testified that he did not receive a response to his emergency mental health grievance within 24 hours.

114.     He admitted that he was seen by Ms. Johnson on November 10, 2010.

115.      Mr. Brown claimed that Ms. Johnson would not give him a copy of his emergency mental health grievance.  Mr. Brown also claimed that Ms. Johnson destroyed the emergency mental health grievance.

116.    Ms. Johnson testified that she does not recall receiving Mr. Brown's emergency mental health grievance and that she did not tear up or direct anyone else to tear up or destroy a grievance written by Mr. Brown.

117.    According to Ms. Johnson, she met with Mr. Brown on November 10, 2010, as a result of a request for mental health services he sent on November 8, 2010.

**November 10, 2010 Meeting With Ms. Johnson**

118.    Mr. Brown met with Ms. Johnson on November 10, 2010.

119.    This meeting took place in the Tucker Unit Dining Hall.

120.    Mr. Brown testified that the meeting lasted for approximately five minutes.

121.    Ms. Johnson testified that the meeting lasted at least five minutes and likely longer for her to obtain as much information as she recorded in the condensed health services encounter regarding the meeting.  *See* Defs.' Ex. 23.

122.    Ms. Johnson's office is housed outside of the prison, on the compound, but in a separate building.  She testified that she went into the prison to meet with Mr. Brown in the Tucker Unit Dining Hall.

123.    Ms. Johnson met with Mr. Brown away from other inmates in the Tucker Unit Dining Hall due to confidentiality concerns.

124.    Mr. Brown claimed that, during the meeting, he told Ms. Johnson he was having hallucinations, hearing voices, that his thoughts were not right, and that he thought he might hurt someone.  He claimed he was suffering from sleep deprivation.  He asked to get more rest, perhaps counseling, and maybe medication.  He also testified that he told Ms. Johnson, if this meant he needed to take a break from CSATP/TC, "so be it."

125.     According to Mr. Brown, Ms. Johnson did not seem concerned about the possibility that he could snap and harm another inmate.

126.     According to Mr. Brown, Ms. Johnson did not give him treatment or give him a waiver to execute declining mental health treatment.  He claims she gave him no relief at all.

127.     Ms. Johnson recalled that Mr. Brown's concerns related mostly to CSATP/TC. She recalled specifically that Mr. Brown wanted mental health to remove him from CSATP/TC.

128.     Mr. Brown initially denied asking Ms. Johnson to refer him out of CSATP/TC when asked about it on cross examination.

129.     When questioned directly about the statement that appears in Ms. Johnson's written notes regarding their meeting, Mr. Brown did not deny that he asked Ms. Brown to refer him out of CSATP/TC.  Defs.' Ex. 23.

130.     When questioned directly about the comments in Ms. Johnson's written notes regarding their meeting, Mr. Brown did not deny that he questioned whether the ADC could make the clinical decision to have him removed from CSATP/TC.  *Id.*

131.     Ms. Johnson explained to Mr. Brown that mental health services could not approve or direct the removal of anyone from CSATP/TC.

132.     Ms. Johnson testified that she could provide mental healthcare and mental health treatment to an inmate participating in CSATP/TC.

133.     Ms. Johnson claimed that she offered to place Mr. Brown in the psychiatric clinic, to have Mr. Brown evaluated by the psychiatrist who then could assess him to determine treatment and medication needs.

134.     Ms. Johnson testified this was the only option she could offer to Mr. Brown.

135.     Ms. Johnson was not, and is not, authorized to dispense medications.

136.    Ms. Johnson testified that Mr. Brown refused the services of the psychiatric clinic.

137.    Ms. Johnson explained that Mr. Brown was not required to sign a refusal of medical treatment form because it was his choice whether to pursue the option she offered.

138.    Ms. Johnson recorded a "SOAP note" regarding her meeting with Mr. Brown. *See* Defs'. Ex. 23.

139.    Ms. Johnson claimed that those portions of her SOAP note that appear in quotations are statements attributable directly to Mr. Brown.

140.    Ms. Johnson acknowledged that Mr. Brown reported that he could easily snap and crack one of the clients in the program with him.

141.    Despite this, Ms. Johnson documented that Mr. Brown did not appear to be in any mental health distress at the time she met with him.

142.    Ms. Johnson explained that she made and documented that observation based on Mr. Brown's presence, demeanor, attitude, and behavior during their meeting.

143.    However, Ms. Johnson noted that Mr. Brown did not make good eye contact.  She described him as keeping his head down or just looking around the room.

144.    Ms. Johnson testified that she was concerned about Mr. Brown's representation regarding the potential to snap, both as a mental health advisor and due to the security concerns triggered by that representation.

145.    In regard to her concerns as a mental health advisor, Ms. Johnson explained that she always asks an inmate if he or she is suicidal or homicidal.  If so, she asks whether the inmate has a plan to threaten or harm himself or herself or others.

146.    She determined that none of those issues existed with Mr. Brown based on her meeting with him.

147.    Ms. Johnson claimed that she asked Mr. Brown if he was having suicidal or homicidal ideations the day of their meeting and that Mr. Brown denied he was.

148.    Ms. Johnson claimed that she told Mr. Brown that day, if his situation changed, he could refer himself back to mental health services or have an officer call.  She explained that an inmate need not complete a written request for mental health services.

149.    In regard to her safety concerns, Ms. Johnson explained that she forwarded Mr. Brown's emergency request for mental health services to Warden Williams, as documented in her SOAP note, because Mr. Brown stated that he could easily snap and harm one of the inmates in the CSATP/TC program.

150.    When asked why she did this, especially in the light of her comments that she did not believe Mr. Brown was suffering from mental health distress or likely to harm himself or others, Ms. Johnson explained that she believed it was a security concern and that she was required to report it to the Warden so that other prison officials in a position to watch Mr. Brown would be aware.

151.    She believed that, by the time she spoke with him, Mr. Brown had been sanctioned by CSATP/TC and was upset with being assigned to the program, but she did not believe that Mr. Brown was in any mental health distress that warranted seeing a psychiatrist.

152.    Ms. Johnson disclaimed that she told Mr. Brown at any time to sign out of CSATP/TC.

153.    To the contrary, she claimed she encouraged him to continue working with his counselor and peer counselors.

154.    She told Mr. Brown, having completed three months of the program, he had only a few months to go.  She understood it to be a nine month program.

155.    Ms. Johnson testified that Mr. Brown thought that she could help him be removed from CSATP/TC.  Ms. Johnson claimed that, once she established that mental health services did not have the authority to do that, Mr. Brown told her that he would move forward with his lawsuit.

156.    Mr. Brown claimed that portions of Ms. Johnson's SOAP note regarding their meeting were false.  *See* Defs.' Ex. 23.

157.    Mr. Brown denied making any statements about members of the military and methamphetamines.

158.    Mr. Brown denied making any statements demanding that others stay out of his business or leave him alone.

159.    Mr. Brown essentially claimed that Ms. Johnson refused to treat him because he was in CSATP/TC and advised him to go back to his CSATP/TC counselors.

160.    Ms. Johnson disclaimed telling Mr. Brown at any time that she would not or could not provide or offer mental health services to him.

161.    Mr. Brown claimed that Ms. Johnson did not offer to permit him to see a psychiatrist and offered no treatment, other than advising him to go back to his CSATP/TC counselors.

162.    Mr. Brown asserted that, at the time he spoke with Ms. Johnson, he had not filed a lawsuit.

163.    Mr. Brown filed his complaint in this matter on November 10, 2010.  *See* Dkt. No. 2.

164.     Mr. Brown asserted that, at the time he spoke with Ms. Johnson, he was not on a "no-talk contract" with CSATP/TC.

165.     On November 9, 2010, Mr. Brown received a behavior contract for the duration of CSATP/TC along with a seven-day timeout as a result of his conduct in CSATP/TC.  *See* Defs.' Ex. 21.

166.     Mr. Brown claimed that he asked Ms. Johnson if she could help him and that he left it to her as to the course of treatment.  He claimed that he told her, if she contacted the treatment people and arranged for him to sleep a little bit, that might help.

167.     Despite representations regarding the status of his lawsuit, Mr. Brown admitted that he threatened to sue Ms. Johnson for failure to treat him.

168.     Mr. Brown testified that, at that time after he threatened to sue her, Ms. Johnson advised Mr. Brown that he could sign out of CSATP/TC.

169.     Mr. Brown did sign out of the program.  *See* Defs.' Ex. 24.

170.     Mr. Brown described it as a frightful time in his life to be having hallucinations, to be hearing voices, and then to have that coupled with knowing that he had to complete CSATP/TC to get out of prison.

171.     Mr. Brown testified that he filed a step one grievance after filing the emergency mental health grievance.  He wanted to document that the officer to whom he gave the emergency mental health grievance had followed procedure with that grievance.

172.     Mr. Brown claimed he received no answer to the step one grievance.

173.     As a result, Mr. Brown testified that he filed a step two grievance.

174.     In his step two grievance, Mr. Brown claimed that his emergency mental health grievance was not answered, that Ms. Johnson lied, that she refused to help him while he was in

the CSATP/TC, that she told him to sign out of the CSATP/TC even though he was stipulated to complete that program, and that he received a disciplinary.

175.    Mr. Brown testified he received a disciplinary as a result of all of these events.

176.    Mr. Brown claimed that he was reduced to a class two, that everything was suspended, that he could not talk on the telephone, that he could not write letters, and that he could not get visitation.

177.    Mr. Brown seeks $10,000.00 in compensatory damages from each defendant because he believes he suffered needlessly.  He testified that it was a hopeless, scary, frightening, stressful time in his life; that he received no help despite following ADC's procedures; and that this went on for several weeks.

178.    Mr. Brown also seeks punitive damages because he believes the system failed him and that it was done deliberately.  According to Mr. Brown, Mr. Chism said that he would assist Mr. Brown in receiving mental health treatment but did not.  Mr. Brown believes he was not afforded treatment because Ms. Johnson deliberately and cruelly claimed that she did not get involved with TC business.

### **Conclusions of Law:  Actual Injury**

179.    The Prison Litigation Reform Act ("PLRA") requires federal courts to screen prisoner complaints.  28 U.S.C. § 1915.

180.    A prisoner cannot sustain an Eighth Amendment claim unless he can show that he suffered some "actual injury."  *See White v. Holmes*, 21 F.3d 277, 281 (8th Cir. 1994) ("While serious injury is not necessary, some actual injury is required in order to state an Eighth Amendment violation.").  The PLRA provides that no federal civil action may be brought by a

prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody, without a prior showing of physical injury.  42 U.S.C. § 1997e(e).

181.    Moreover, § 1983 liability for an Eighth Amendment violation requires a compensable injury be greater than *de minimis*.  *See Irving v. Dormire*, 519 F.3d 441, 446-48 (8th Cir. 2008) (an inmate must prove an actual injury and cannot recover for the *de minimis* use of force, unless repugnant to the conscience of mankind); *Seltzer-Bey v. Delo*, 66 F.3d 961, 964 (8th Cir. 1995) (determining no constitutional violation where inmate fails to demonstrate that he suffered an injury or adverse health consequence as a result of his confinement); *Cummings v. Malone*, 995 F.2d 817, 822-23 (8th Cir. 1993) (actual injury is required, but recognizing that nominal damages may be awarded); *Prater v. Dahm*, 89 F.3d 538, 541 (8th Cir. 1996).  This standard has been defined as requiring a "common-sense category approach to the injury; would the injury require or not require a free world person to visit an emergency room, or have a doctor attend to, give an opinion, diagnosis and/or medical treatment for the injury?"  *Luong v. Hatt*, 979 F. Supp. 481, 486 (N. D. Tex. 1997).

182.    Despite this requirement, this Court acknowledges that, in some circumstances, personal humiliation and mental anguish and suffering are compensable under the Eighth Amendment when the prisoner is subjected to degrading and humiliating treatment or the unnecessary and wanton infliction of pain at the hands of prison officials.  *See, e.g.*, *Cowans v. Wyrick*, 862 F.2d 697, 699 (8th Cir. 1988) (noting that the Eighth Amendment prohibits the unnecessary and wanton infliction of pain).  The cases in which recovery is permitted for emotional suffering generally involve degrading treatment or the wanton infliction of pain.  *Id.*

183.    This Court is mindful of and takes seriously the need for mental health services by the inmate population.  The Court recognizes that a lack of availability of those services can lead to actual injury that is more than *de minimis*.

184.    Here, because the Court determines that the evidence shows defendants Mr. Chism and Ms. Johnson did not act with deliberate indifference, the Court does not decide whether Mr. Brown has established an actual injury that is more than *de minimus* for purposes of the PLRA.  *See Bender v. Regier*, 385 F.3d 1133, 1137 (8th Cir. 2004) (determining that the plaintiff failed to prove the defendant acted with deliberate indifference and, therefore, not deciding whether the plaintiff proved a serious medical need under the Eighth Amendment).

**Conclusions of Law:  Serious Medical Needs**

185.    Prison officials violate an inmate's Eighth Amendment right to be free from cruel and unusual punishment if the prison officials commit "acts or omissions sufficiently harmful to evidence deliberate indifference to [an inmate's] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  This principle extends to an inmate's mental-health-care needs. *See, e.g.*, *Greason v. Kemp*, 891 F.2d 829, 834 (11th Cir. 1990) (citing cases).

186.    The Eighth Circuit has interpreted this standard as including both an objective and a subjective component:   "The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs." *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997).

187.    "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).  A serious

medical need is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997) (quoting *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995)).

188.    Here, because the Court determines that the evidence shows defendants Mr. Chism and Ms. Johnson did not act with deliberate indifference, the Court does not decide whether Mr. Brown has established a serious medical need.   *See Bender*, 385 F.3d at 1137 (determining that the plaintiff failed to prove the defendant acted with deliberate indifference and, therefore, not deciding whether the plaintiff proved a serious medical need under the Eighth Amendment).

### Conclusions of Law:  Deliberate Indifference

189.    "[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996).   As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment. *Id.*

190.    A prison official is deliberately indifferent if the prison official knows of and disregards a serious medical need or a substantial risk to an inmate's health or safety. *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 528 (8th Cir. 2009); *see Brown v. Fortner*, 518 F.3d 552, 558 (8th Cir. 2008).   To establish deliberate indifference, the inmate must show more than negligence, more even than gross negligence. *Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008); *Jones v. Minn. Dep't of Corr.*, 512 F.3d 478, 482 (8th Cir. 2008).

191.     In a § 1983 action, both compensatory and punitive damages are available upon proper proof.  *Cunningham v. City of Overland*, 804 F.2d 1066, 1069 (8th Cir. 1986). Compensatory damages in a § 1983 action are mandatory and awarded as a matter of right once liability is found.  *Smith v. Wade*, 461 U.S. 30, 52 (1983).

192.     An inmate's difference of opinion over matters of expert judgment or a course of medical treatment does not amount to a constitutional violation.  *Nelson v. Shuffman*, 603 F.3d 439, 448 (8th Cir. 2010); *Meuir v. Greene Cnty. Jail Emps.*, 487 F.3d 1115, 1118-19 (8th Cir. 2007).

193.     The Court determines that Mr. Chism was not deliberately indifferent to Mr. Brown's needs.  The Court credits Mr. Chism's testimony that he was accessible to and available to meet with inmates.

194.     Mr. Chism met with Mr. Brown and Mr. Davis on November 5, 2010.  As a result of Mr. Brown's claims during that meeting that he was suffering from hallucinations, auditory hallucinations, bad thoughts, and mental health issues, Mr. Chism was concerned.

195.     While the Court may question why Mr. Chism did not inquire of Mr. Brown at that meeting whether he felt like harming himself or anyone else, the Court determines that Mr. Chism is not a mental health counselor trained in evaluating Mr. Brown's claimed symptoms or an individual who could have provided treatment to Mr. Brown.

196.     Mr. Chism did speak with mental health services that same day and made them aware of Mr. Brown's claims.  The Court credits Mr. Chism's testimony that he has no authority to tell a mental health advisor when to see or whether to see an inmate.

197.    The Court also determines that Ms. Johnson was not deliberately indifferent to Mr. Brown's needs.  It is undisputed that Ms. Johnson and Mr. Brown met in the Tucker Unit Dining Hall.

198.    Ms. Johnson recalled that Mr. Brown's concerns related mostly to CSATP/TC. She recalled specifically that Mr. Brown wanted mental health to remove him from CSATP/TC.

199.    When questioned directly about the statement that appears in Ms. Johnson's written notes regarding their meeting, Mr. Brown did not deny that he asked Ms. Brown to refer him out of CSATP/TC.  When questioned directly about the comments in Ms. Johnson's written notes regarding their meeting, Mr. Brown did not deny that he questioned whether the ADC could make the clinical decision to have him removed from CSATP/TC.

200.    Ms. Johnson explained to Mr. Brown that mental health services could not approve or direct the removal of anyone from CSATP/TC.

201.    Ms. Johnson claimed that she offered to place Mr. Brown in the psychiatric clinic, to have Mr. Brown evaluated by the psychiatrist who then could assess him to determine treatment and medication needs.  Although Mr. Brown denied that Ms. Johnson did this, Ms. Johnson testified this was the only option she could offer to Mr. Brown.

202.    Ms. Johnson was not, and is not, authorized to dispense medications.

203.    Ms. Johnson could not remove Mr. Brown from CSATP/TC.

204.    Ms. Johnson testified that Mr. Brown refused the services of the psychiatric clinic.  Although the Court is somewhat skeptical of Ms. Johnson's explanation that Mr. Brown was not required to sign a refusal of medical treatment form because it was his choice whether to pursue the option she offered, there is no evidence in the record of an ADC policy or practice that contradicts her testimony, and the Court accepts her testimony as true.

205.    Ms. Johnson recorded a SOAP note regarding her meeting with Mr. Brown.   *See* Defs'. Ex. 23.

206.    Ms. Johnson acknowledged that Mr. Brown reported in the emergency mental health grievance he submitted that he could easily snap and crack one of the clients in the program with him.   Ms. Johnson explained through her testimony her view of this statement. She also explained the way in which she handled her concerns about this statement, both as a mental health advisor and as a result of the security concerns triggered by the statement.   The Court accepts her testimony as true and determines there is no evidence that Ms. Johnson knew of a condition that created an excessive risk to Mr. Brown's health and then failed to act on that knowledge.

207.    Ms. Johnson assessed the risk presented by Mr. Brown's statement and acted as she determined appropriate based on her knowledge, skill, experience, and training.   Ms. Johnson explained that she believed Mr. Brown's statements were a security concern and that she was required to report it to the Warden so that other prison officials in a position to watch Mr. Brown would be aware.   She also assessed Mr. Brown and satisfied herself as a mental health advisor that Mr. Brown was not suffering from mental health distress or likely to harm himself or others.

208.    Ms. Johnson testified that Mr. Brown thought that she could help him be removed from CSATP/TC.   Ms. Johnson claimed that, once she established that mental health services did not have the authority to do that, Mr. Brown told her that he would move forward with his lawsuit.

209.    Her testimony is not that different from Mr. Brown's testimony on this point.   Mr. Brown admitted that he threatened to sue Ms. Johnson for failure to treat him.   Mr. Brown

testified that, at that time after he threatened to sue her, Ms. Johnson advised Mr. Brown that he could sign out of CSATP/TC.  Mr. Brown did sign out of the program.

210.    At the time Mr. Brown spoke with Ms. Johnson, he had drafted and submitted for filing his lawsuit.  *See* Dkt. No. 2.  He also had received the day before his talk with Ms. Johnson a behavior contract for the duration of CSATP/TC along with a seven-day timeout as a result of his conduct in CSATP/TC.  *See* Defs.' Ex. 21.

211.    Although Mr. Brown might disagree with Ms. Johnson's response to Mr. Brown's situation, Mr. Brown's difference of opinion over matters of expert judgment or a course of medical treatment does not amount to a constitutional violation.  *Nelson*, 603 F.3d at 448; *Meuir*, 487 F.3d at 1118-19.

212.    For these reasons, the Court determines Ms. Johnson was not deliberately indifferent to Mr. Brown's needs.

213.    Because the Court determines that neither Mr. Chism nor Ms. Johnson were deliberately indifferent to Mr. Brown's needs, the Court declines to award to Mr. Brown compensatory damages.

### Conclusions of Law:  Punitive Damages

214.    Punitive damages in a § 1983 action are awarded or rejected in a particular case at the discretion of the fact finder once sufficiently serious misconduct by the defendant is shown. *Smith*, 461 U.S. at 52.

215.    Because the Court determines neither Mr. Chism nor Ms. Johnson were deliberately indifferent to Mr. Brown's needs and declines to award to Mr. Brown compensatory damages, the Court does not reach the issue of punitive damages in this case.

SO ORDERED this the 28th day of October, 2014.

Kristine G. Baker
United States District Judge